AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

SOUTHERN DISTRICT OF NEW YORK

DAWNE LULEFFE on behalf of herself and all others similarly situated

**SUMMONS IN A CIVIL CASE**

V.

BANK OF AMERICA, N.A., COLUMBIA ~~SERIES~~ FUNDS SERIES TRUST f/k/a NATIONS FUNDS TRUST, WILLIAM P. CARMICHAEL and BANK OF AMERICA CORPORATION

CASE NUMBER:

**06 CV 1435**

**JUDGE KOELTL**

TO: (Name and address of defendant)

All Defendants

YOU ARE HEREBY SUMMONED and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Daniel Cobrinik
2 Grand Central Tower
140 E 45th Street
New York, NY 10017

an answer to the complaint which is herewith served upon you, within __30__ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

FEB 2 2 2006

DATE

(BY) DEPUTY CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAWNE LULEFF on behalf of herself and )
all others similarly situated, )
)
)  Case No.
Plaintiff, )
v. )  JURY TRIAL DEMANDED
)
BANK OF AMERICA, N.A.; )
COLUMBIA FUNDS SERIES TRUST )
f/k/a/ NATIONS FUNDS TRUST; WILLIAM )
P. CARMICHAEL and BANK OF )  CLASS ACTION
AMERICA CORPORATION, )
)
Defendants. )

06 CV 1435

JUDGE KOELTL

## COMPLAINT

Plaintiff Dawne Luleff, on behalf of her daughter Desire Cobble and for all other members of the Class hereinafter described, alleges the following on information and belief:

## PRELIMINARY STATEMENT

1. Plaintiff brings this Class Action in her capacity as co-trustee for her daughter Desire Cobble and on behalf of all other members of the Class defined below, arising out of, *inter alia*, breaches of fiduciary and contractual duties owed by the defendants Bank of America, N.A. (the "Bank"), the Bank's parent Bank of America Corporation ("BAC") and their affiliate, Columbia Funds Series Trust f/k/a Nations Funds Trust ("NFT").

2. Sometime prior to 2000, Defendants decided that fiduciary assets under their management, including the assets of Desire Cobble's special needs trust (the "Cobble Trust") should be invested in mutual funds managed by the Bank's affiliate NFT, and in particular, the Nations Funds. (the "Investment Policy")

3. The Investment Policy was motivated by, among others, three principal factors:

   A. Defendants' interest in receiving investment advisory and other income from the fiduciary accounts entrusted to the Bank;

      B.      Defendants' interest in passing off the Bank's administrative expenses of investing the assets in fiduciary accounts to the beneficiaries of those fiduciary accounts; and

      C.      Defendants' interest in increasing the asset base of its Nations Funds family of mutual funds (the "Proprietary Funds") to make such funds appear to be more attractive investments to independent investors.

4. As a sophisticated corporate fiduciary, the Bank knew that the Investment Policy would substantially increase the investment advisory fees, operating expenses and other fees charged to beneficiaries of trust accounts and other fiduciary accounts, without offering commensurate, or indeed, any, benefits to the beneficiaries of those accounts.

5. The Bank also knew that many of its Proprietary Funds had substandard investment performance, and that others had no performance history at all. It also knew that the expense ratios of the Proprietary Funds were higher than they should have been because, *inter alia*, NFT, its Trustees/Directors, including defendant Carmichael, failed to take appropriate steps to seek alternate advisors and service providers for the Proprietary Funds.

6. From 1999 through 2003, defendants reaped additional fees and other benefits by selling to Canary Investment Management LLC ("Canary") and other favored business customers of the Bank the right (1) to purchase shares in the Bank's Proprietary Funds after the close of trading hours, at the closing price for the end of the day; and (2) to make "market timing" trades of shares in the Proprietary Funds.

7. In effect, Defendants received a fee from Canary and these other customers of the Bank for allowing them to skim money off the Proprietary Funds where the Bank had invested fiduciary assets entrusted to its care and management. Notwithstanding Defendants' profits from the skim of fiduciary investments, the Bank, as well as the other Defendants, knew that mutual funds which allowed late trades and market timing trades were particularly unsuitable for investment of trust assets and other fiduciary account assets.

<a>
<b>
</b>
</a>

8. In short, the Bank knew that the Investment Policy would adversely affect all members of the Class of fiduciary account beneficiaries, as defined below, even though this Investment Policy would greatly benefit the Bank and its affiliates.

**Jurisdiction and Venue**

9. The substantive claims asserted herein arise under and pursuant to state statutes and common law.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1711, the Class Action Fairness Act of 2005, and 28 U.S.C. § 1367. The amount in controversy exceeds $5,000,000 exclusive of interest and costs and there is diversity of citizenship between plaintiff and each of the defendants.

11. Significant conduct of the defendants as described herein occurred within the Southern District of New York, including but not limited to the aforementioned late trading and market timing transactions by Defendants. Each of the Defendants have conducted substantial business operations within this District during the time period of the wrongdoing alleged herein.

12. Defendants have continuous and systematic contacts with the Southern District of New York, including, in particular, efforts to market the Proprietary Funds in New York. Accordingly, this Court has personal jurisdiction over the Defendants.

13. Venue is proper in this District as many of the acts and practices complained of occurred in this District. Further, many witnesses to the wrongdoing referred to herein reside in or did business within this District, and many members of the Class reside in this District.

**The Parties**

14. Plaintiff Dawne Luleff is the mother of Desire Cobble, a minor who is the beneficiary of The Desire Cobble Supplemental Needs Trust established by means of a Trust Agreement dated November 8, 2001 ("Cobble Trust"). Plaintiff is co-trustee of the Cobble Trust. Plaintiff is a resident of the City of St. Louis, in the State of Missouri.

15. Defendant BAC is a Delaware holding company which owns the shares of numerous subsidiaries including those of defendant Bank.

16. The Bank is a national Bank with offices throughout the United States and the world, including many offices in the Southern District of New York. The Bank was formerly a Trustee of the Cobble Trust.

17. Defendant NFT is a Delaware statutory trust which actively conducts business within this District. NFT is an affiliate of the other defendants. Although NFT is nominally controlled by a Board of Trustees pursuant to Delaware statutory law and the provisions of the Investment Company Act of 1940, the Bank exercises *de facto* control over defendant NFT.

18. Defendant NFT, through its Trustees/Directors, oversees and administers the investments in the Nations Funds, pursuant to contracts with subsidiaries and affiliates of the Bank, which also provide for fees certain other services in connection with the operation of the Nations Funds.

19. By virtue of her status as the beneficiary of a fiduciary account managed by the Bank, Plaintiff's daughter is a third-party beneficiary of NFT's investment management contracts with the other Defendants.

20. Defendant William P. Carmichael, at times relevant herein, was Chairman of the Board of Trustees of NFT. Upon information and belief, he was selected for and elected to such position directly or indirectly by BAC and the Bank or their respective affiliates or employees.

**The Fiduciary Duties Owed By the Bank**

21. The Bank served as a fiduciary for plaintiff's daughter and for the other members of the putative Class. As such, the Bank owed plaintiff, her daughter and other members of the Class several fiduciary obligations, including:

> A. An obligation of complete loyalty to the interests of the beneficiaries of its fiduciary accounts, to the exclusion of any selfish interest;
>
> B. An obligation to invest fiduciary assets prudently; and
>
> C. An obligation of full and fair disclosure to fiduciary account beneficiaries.

**The Investment Policy Decision**

22.     Some time before the year 2000, officers of the Bank decided that all or virtually all fiduciary investments other than investments in proprietary mutual funds should be divested, that the proceeds should be reinvested in the Nations Funds managed by Defendants and their affiliates and that in the future all or as many fiduciary assets should be invested in the Nations Funds. All policy decisions relating to the investment of Cobble Trust assets – including the Investment Policy – were made at the corporate level by the Bank. The Bank's trust officers and portfolio managers had no real investment discretion with regard to the Cobble Trust account and the other fiduciary accounts entrusted to the Bank.

23.     Pursuant to the Investment Policy, all assets of the Cobble Trust, and the assets of other fiduciary accounts within the putative Class defined below, were invested in at least some of the Proprietary Funds.

**Defendants' Motives for The Investment Policy**

24.     Although nominally independent and supervised by its Board of Trustees, defendant NFT has at all relevant times been operated as an *alter ego* of the Bank, BAC and their respective subsidiaries. All members of NFT's Board of Trustees were selected and/or approved by the other Defendants. Until the recent settlement of certain Securities & Exchange Commission claims against Defendants, no outsider had any role whatsoever in the selection and re-election of NFT's Trustees other than the Bank, BAC and their senior officers. As such, the Bank and BAC controlled NFT and the Proprietary Funds which NFT managed.

25.     The Investment Policy was motivated in large part by the desire of the Bank to generate additional income from the trusts and other fiduciary accounts under its management. Prior to implementation of the Investment Policy, the Bank received a fee for acting as trustee or executor or conservator for its fiduciary accounts but neither the Bank nor any of its affiliates received a separate fee for investments held in the Bank's Common Trust Funds or in independent investment vehicles. After implementing the Investment Policy, the Bank continued to receive its fee for acting as a fiduciary, but subsidiaries and affiliates now received, directly

and indirectly, investment advisory and other fees from the Bank's Fiduciary Accounts for managing the Proprietary Funds in which fiduciary assets were invested.

26. The Investment Policy was also motivated in large part by the Bank's desire to reduce its own administrative expenses. Prior to implementation of the Investment Policy, the fiduciary fees paid by fiduciary account beneficiaries covered all administrative costs of managing the investments for such accounts. After implementing the Investment Policy, the administrative and managerial fees of investing fiduciary assets were paid by the Proprietary Funds and this cost was passed along to the Bank's fiduciary accounts, including the Cobble Trust and other fiduciary accounts and reflected in lower net investment returns. Notwithstanding the fact that plaintiff, her daughter and other members of the Class were now paying both investment advisory fees and administrative expenses to NFT, the Bank continued to charge for its "services" as corporate fiduciary, although it applied minimal credits against such charges. The credits did not ameliorate the total expenses of having fiduciary assets invested in Nations Funds.

27. The Investment Policy was also motivated in large part by Defendants' desire to attract other investors to the Nations Funds, thereby further increasing the income of BAC and the Bank. By moving fiduciary investments into their Proprietary Funds, BAC and the Bank greatly increased the asset base of those funds. This large asset base was a major Nations Funds selling point for retail investors, thereby benefitting all defendants.

**The Adverse Consequences of the Investment**
**Policy on the Bank's Fiduciary Accounts**

28. Although the Investment Policy was beneficial to Defendants, it imposed substantial additional expenses and disadvantages upon plaintiff, her daughter and the other members of the putative Class.

29. First, the Investment Policy forced fiduciary accounts to pay artificially high – and unnecessary – investment advisory and other fees and expenses. These charges were considerably more than the investment advisory and other fees and expenses charged by Vanguard Group and many other mutual fund families. Prior to implementation of the

Investment Policy, many of the Bank's fiduciary accounts were invested in the Bank's Common Trust Funds, which did not charge any investment advisory fees.

30. Second, the Investment Policy stripped plaintiff, her daughter and other members of the Class of their right to a loyal trustee who would make prudent investment decisions solely on their behalf based on investment performance, expenses and other rational bases. The Bank made investment decisions, including its Investment Policy, based on its own self interest rather than the best interest of the beneficiaries of its fiduciary accounts, as evidenced by the fact that it invested fiduciary accounts in Proprietary Funds which had substandard investment performance histories, in Proprietary Funds which had no investment track record at all, and in Proprietary money market funds which generated lower net investment returns than the Bank paid on deposits of cash to customers who walked in off the street or from nearly identical money market funds offered by competitors.

31. Defendants knew that the increased fees and expenses, as well as investment decisions made without regard to likely investment performance were not in the best interests of plaintiff, her daughter and the other fiduciary account beneficiaries.

32. The Bank's motive for investing fiduciary assets in these Proprietary Funds is obvious: these Proprietary Funds generated additional fees and other income, as well as intangible benefits for the Bank and its affiliates.

**Defendants' Participation in the Looting of
<u>Fiduciary Assets Through Late Trading and Market Timing</u>**

33. By law, parties who purchase interests in mutual funds after the close of business (4:01 pm Eastern Standard Time), are required to pay closing price of the fund on the following business day. This "forward pricing" ensures that investors cannot use information which becomes public after the close of business to participate in gains made by other investors who did not have access to this information.

34. Notwithstanding the "forward pricing" rule, Defendants allowed Canary and other favored business customers of the Bank to buy and sell shares of certain of the Proprietary Funds after the close of business, paying the closing price ("NAV") of the previous day. In effect, these

business customers were allowed to share in profits made by fiduciary account investments, without undertaking the same risk as the fiduciary account investments in the affected Nations Funds.

35. To make matters worse, Canary and others were allowed to engage in market timing trades in and out of the Proprietary Funds, in violation of the stated policies of those funds. The Nations Funds prospectus stated in pertinent part:

> The interests of a Fund's long term shareholders and its ability to manage investments may be adversely affected when its shares are repeatedly bought and sold in response to short term market fluctuations – also known as "market timing." The exchange privilege is not intended as a vehicle for market timing. Excessive exchange activity may interfere with portfolio management and have an adverse effect on all shareholders.

36. In internal emails, Defendants' employees reiterated "Our stated policy for the Funds, and our representation to the Board, is that we do not allow market timing activity."

37. Notwithstanding Defendants' knowledge that allowing Canary and other favored Bank customers to late trade and to engage in "market timing activity" would be detrimental to the interests of the Bank's fiduciary accounts invested in the Proprietary Funds – and its stated policies against permitting such trades – Defendants allowed these customers to engage in these activities.

**The Bank's Failure to Act in the Best
Interests of its Fiduciary Account Beneficiaries**

38. Pursuant to the Investment Policy, the Bank instructed all trust officers and portfolio managers to invest the assets of fiduciary accounts, whenever feasible, only in the Proprietary Funds, thereby preventing them from using their independent discretion for the benefit of fiduciary account beneficiaries.

39. Defendant Carmichael and his fellow Trustees of NFT failed to oversee the management, expenses and investment results for each of the individual Nations Funds, in violation of their fiduciary obligations to plaintiff, her daughter and other members of the Class. Instead, they relied on the Bank, its subsidiaries and affiliates, which were solely motivated by their own self-interest.

40. NFT and its Board, including defendant Carmichael, retained subsidiaries and affiliates of the Bank to serve as advisors and to provide various administrative services to the Nations Funds without soliciting less expensive bids from other independent companies and without determining whether others were better equipped to manage the assets of the Bank's fiduciary accounts and/or could do so at lower expense levels.

41. The Bank's subsidiaries and affiliates set the advisory fees and other expenses charged to the various Nations Funds at artificially high levels, in order to maximize the fees generated for themselves and without regard for the best interests of the beneficiaries of the fiduciary accounts whose assets were invested in Nations Funds. These high fees and expenses, determined on a no-bid basis were all passed along to the beneficiaries of the Bank's fiduciary accounts invested in the Nations Funds, including the Cobble Trust and the fiduciary accounts of other putative Class members.

42. By refusing to negotiate fees and expenses and to consider independent investment advisors and service providers who might be better suited to the individual needs of individual fiduciary account beneficiaries, the Bank breached its fiduciary obligations of loyalty and prudence to plaintiff, her daughter and other members of the putative Class, all of which was aided and abetted by the other defendants.

43. By allowing market timing and late trading in the Nations Funds, Defendants breached their fiduciary obligations of loyalty and prudence to plaintiff, her daughter and the other members of the putative Class.

**Defendants' Failure to Make Full and Fair Disclosure**

44.     Notwithstanding their fiduciary obligation of full and fair disclosure, NFT, the Bank and BAC sent plaintiff, other co-fiduciaries and members of the Class deceptive Nations Funds prospectuses and other "disclosure documents" which concealed material facts regarding the Bank's purchase of shares in Nations Funds for fiduciary accounts. In particular, those documents failed to disclose (1) that the Nations Funds had higher expense ratios than other comparable mutual funds; (2) that the Bank and BAC had chosen subsidiaries and affiliates of the Bank as investment advisors and service providers to the Nations Funds on a no-bid basis without making any effort to determine whether other investment advisors and service providers were less expensive and/or otherwise better suited to the needs of the Bank's fiduciary accounts; (3) that the Bank and BAC chose their subsidiaries and affiliates as advisors and service providers solely for their own benefit, and in particular to increase their income; (4) that the Bank, BAC, their affiliates and customers were making money by selling "market timing" rights and "late trading" rights; and (5) that these policies would inevitably be very expensive for fiduciary accounts and very lucrative for the Bank, its affiliates, subsidiaries and customers.

45.     In addition to fiduciary accounts whose assets were invested in the Nations Funds from the outset, the Bank informed certain co-fiduciaries and members of the Class that the divestiture of other investments (such as Common Trust Funds) and the reinvestment of fiduciary assets in the Nations Funds were carried out on a "tax-free" basis. However, upon information and belief, this was not the case and, among the additional expenses that fiduciary accounts absorbed as a result of the divestiture and reinvestment were capital gains taxes that they should not have had to pay.

46.     Beginning in or about February 2000, if not earlier, the Bank's "Private Bank" began sending out standardized form letters informing some co-fiduciaries, beneficiaries of fiduciary accounts and others of the Bank's planned closing of its "Common Trust Funds" and/or otherwise touting the so-called "benefits" of the conversion to the Nations Funds. In fact, there was little, if any, material substantive benefit to fiduciary account beneficiaries from the

Investment Policy that could not have been accomplished more efficiently and at lower cost to the fiduciary accounts by other investment alternatives including the Bank's "Common Trust Funds," investment of fiduciary assets in non-proprietary mutual funds and individual management of other assets. However, upon information and belief, the Bank never disclosed this fact to plaintiff, other co-fiduciaries and members of the putative Class.

47.     In response to the deceptive and unclear information provided by the Bank, co-fiduciaries and beneficiaries of the fiduciary accounts gave their uninformed and fraudulently induced "consent" to the investment by the Bank of fiduciary assets in the Proprietary Funds.

48.     The Comptroller of the Currency recognized that the Bank's Wealth Investment Management Group was not handling fiduciary accounts in an appropriate manner, and in or about December, 2004, it required the Bank to sign an Agreement to implement new investment policies and oversight procedures for fiduciary accounts, including plaintiff's account and the accounts of all other class members.

49.     Plaintiff and other members of the putative Class are third party beneficiaries of the Consent Agreement between the Comptroller of the Currency and the Bank.

50.     Notwithstanding the Bank's agreement to implement more responsible investment policies and procedures, it continues to implement the Investment Policy for plaintiffs' account and for all other fiduciary accounts in the Class.

**Class Allegations**

51.     This action is brought by plaintiff for herself, her daughter and on behalf of all others similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and 23(b)(3) for: "all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or other entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors, successors or assigns acted as a trustee, fiduciary or agent and that were directly or indirectly invested in Nations Funds mutual funds at any time from September 8, 1998" to the present, (the "Class"), the quoted portion of which definition was stipulated to by each of the defendants, their affiliates and others in connection with the settlement of certain related claims against them in *In*

*re Mutual Funds Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-Class".

52. Plaintiff seeks: (I) an accounting of all damages caused by defendants to the Cobble Trust and the other members of the Class defined above, and compensation for such damages; (ii) an accounting for Defendants' unjust enrichment and the earnings thereon, and damages for such unjust enrichment; (iii) money damages to be paid by the defendants to the Cobble Trust, the Class and to the affected Nations Funds for the ultimate benefit of the affected fiduciary accounts including that of the Cobble Trust for all fiduciary fees, investment advisory fees and other fees and expenses wrongfully charged to plaintiff and the other members of the Class; (iv) injunctive relief providing members of the putative Class the right to remove the Bank as fiduciary for their respective fiduciary accounts; (v) injunctive relief requiring Defendants to implement new procedures to address the Bank's ongoing conflicts of interest in the investment of fiduciary assets including, *inter alia*, the creation of a so-called "Chinese Wall" separating the Bank's fiduciary functions from all other operations; (vi) injunctive relief providing for the Bank's Proprietary Funds to annually select investment advisors chosen based upon, *inter alia*, comparative investment performance and expense; and (vii) for relief incident and subordinate thereto, including punitive damages, attorneys fees and the costs and expenses of this action.

**Numerosity of the Members of the Class**

53. Upon information and belief, the Bank serves or served as a fiduciary (such as a trustee, guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein, and falling within the Class definition as set forth above.

54. The Class represented by plaintiff on behalf of her daughter consists of all those persons who were and/or are beneficiaries of fiduciary accounts for which the Bank was corporate fiduciary affected by the conduct described herein from September 8, 1998 to the present ("Class Period"). This definition is subject to modification upon completion of discovery.

55. The exact number of members of the Class as above described is not known by plaintiff, but is within the sole knowledge of the Bank. Upon information and belief, the members of the Class are so numerous as to make a Class Action appropriate.

56. On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries.

**Common Issues of Law and Fact Predominate**

57. There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia*:

    A. whether the Bank's business decision to invest assets of its fiduciary accounts in the Proprietary Funds was motivated by the best interests of the Class members or by the Bank's desire to generate management and investment advisory fees for its affiliates and subsidiaries, to pawn off its administrative expenses on fiduciary accounts and to make their Proprietary Funds appear more attractive to independent investors by building up their asset bases at the expense of the Bank's fiduciary accounts.

    B. whether the Bank breached fiduciary and contractual duties to plaintiff, her daughter and the members of the Class;

    C. whether Defendants breached their fiduciary and contractual duties to all members of the Class by making investment decisions based on their own interests rather than the interests of fiduciary account beneficiaries;

    D. whether Defendants breached their fiduciary and other duties to members of the Class by their engaging in and otherwise condoning late trading and market timing transactions in certain Proprietary Funds; and

    E. what remedies are appropriate compensation for the damages caused to plaintiff and each member of the Class.

58. The relief sought is common to the entire Class including, *inter alia*:

A.  a declaratory judgment that Defendants violated their fiduciary duties to beneficiaries of the affected fiduciary accounts;

B.  an accounting and an award of compensatory and punitive damages caused by Defendants' breaches of their fiduciary and contractual duties;

C.  payment by the defendants of the costs and expenses of this action, including the attorneys' fees of plaintiff's counsel;

D.  an injunction preventing the Bank from opposing a petition by current beneficiaries of the Bank's fiduciary accounts to replace it as fiduciary;

E.  an injunction which establishes appropriate safeguards to ensure that the interests of fiduciary account beneficiaries are fully protected from wrongdoing such as described herein; and

F.  an accounting to determine the extent of the Bank's unjust enrichment and the damages caused to the Cobble Trust and the other fiduciary accounts by virtue of the Bank's breaches of its fiduciary obligations.

**Typicality of Plaintiff's Claims**

59.  The interests of the plaintiff and each member of the Class have been adversely affected by the wrongdoing of the defendants as described herein.

60.  The assets of the Cobble Trust account, like all other similarly affected fiduciary accounts, were invested by the Bank in shares of the Bank's Proprietary Funds pursuant to a wholesale business decision – i.e., the Investment Policy -- by BAC and the Bank.

61.  Defendants used the Cobble Trust account – just as they used all other similarly situated fiduciary accounts -- to generate additional management, investment advisory and/or other fees and benefits for themselves (even after so-called credits were applied to the Bank's fiduciary accounts as a result of certain Nations Funds advisory fees being paid to subsidiaries of BAC or the Bank) without regard for the best interests of the beneficiaries of such accounts such as plaintiff's daughter and the members of the Class.

62.  The claims of plaintiff are typical of the claims of all members of the Class. The

claims of plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

**Plaintiff Will Fairly and Adequately Represent the Class**

63. The plaintiff is able to and will fairly and adequately protect the interests of the Class.

64. Counsel for plaintiff is experienced and capable of prosecuting complex litigation such as this case. Counsel for plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT I

## BREACH OF FIDUCIARY DUTY

65. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 64 as though fully set forth herein.

66. By virtue of the foregoing breach of their fiduciary obligations, defendants caused damages to plaintiff and each member of the putative Class in an amount to be determined by the Court.

## COUNT II

## BREACH OF CONTRACT

67. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 66 as though fully set forth herein.

68. By virtue of the foregoing breach of its contractual obligation to serve as Trustee of the Cobble Trust, and its agreements to act as corporate fiduciary with respect to each of the other fiduciary accounts in the Class, plaintiff, her daughter and each member of the Class has been damaged in an amount to be determined by the Court.

## COUNT III

## UNJUST ENRICHMENT

69. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 68 above as though fully set forth herein.

70. By reason of the foregoing allegations, the Bank and BAC have "double dipped" and obtained other unjustified benefits as described above.

71. All defendants were unjustly enriched by the investment of the Bank's fiduciary assets in the Bank's proprietary funds at the expense of plaintiff, her daughter and the members of the Class.

72. The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate. Plaintiff and others similarly situated are entitled to recover the defendants' ill-gotten gains and profits therefrom.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests on her own behalf, her daughter and on behalf of all members of the Class:

(a) certification of this action as a Class Action and appointment of plaintiff and her counsel to represent the Class;

(b) entry of judgment on the claims for breach of fiduciary duty in favor of plaintiff individually and as representative of the other members of the Class, and against the defendants, in an amount to be determined by the Court;

(c) entry of judgment on the claims for breach of contract in favor of plaintiff individually and as representative of the other members of the Class in an amount to be determined by the Court;

(d) entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e) entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts affected by the wrongdoing described herein and/or their beneficiaries;

(f) entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC and NFT;

(g) entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia*, the appointment of an ombudsman to oversee the Bank's fiduciary operations and compelling Defendants to select investment advisors for any proprietary investment vehicle used for fiduciary assets on an annual basis based upon, *inter alia*, comparative investment performance, competitive investment advisory fees and expenses;

(h) repayment to the affected Nations Funds and the holders of its stock of the damages caused to them by the defendants' actions as described herein including, in particular, the late trading and market timing transactions described above;

(i) entry of judgment for punitive damages, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j) reasonable counsel fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation; and

(k) such other and further relief as this Court deems just and appropriate.

JURY TRIAL DEMANDED

Dated: February 21, 2006

_____
Daniel Cobrinik (DC 6406)
2 Grand Central Tower
140 East 45th Street -- 25th Floor
New York, New York 10017
(212) 725-6888

Counsel for Plaintiff and the Class